# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

| | |
|---|---|
| WILLIAM I. MEYER, an individual, | Case No.: 18-5383 |
| Plaintiff, | |
| vs. | |
| | COMPLAINT |
| STATE OF WASHINGTON; GLORIA PAPIEZ, Director, Washington Department of Financial Institutions, WILLIAM BEATY, Administrator of the Securities Division of the Washington Department of Financial Institutions, | VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983, DECLARATORY AND INJUNCTIVE RELIEF, 28 U.S.C. §§ 2201, 2202; STATE TORTS CLAIMS; DAMAGES |
| Defendants. | |
| | JURY DEMAND |

## I. PARTIES

1.     Plaintiff, William I. Meyer ("Plaintiff" or "Mr. Meyer"), is a resident of Portland, Oregon. After leaving the United States Marine Corps, Mr. Meyer attended and graduated from Portland State University while working up to three jobs and earning a degree in finance and marketing. Since then, Mr. Meyer has worked in the securities and insurance industries for over 35 years, establishing a Broker-Dealer and a Registered Investment Advisor, and serving as a person responsible for compliance in both of those highly regulated industries. He presently is a private fund manager and has been a successful entrepreneur in the Oregon wine industry.

2.      From May 2007 to December 2013, Mr. Meyer was a licensed registered investment adviser representative in Washington. In over three decades of a successful career managing clients' money, raising private capital, and selling life insurance, Mr. Meyer has never had a client complaint in Washington or anywhere else: not as a securities salesperson, not as an insurance agent, and not as an investment adviser.

3.      This action is taken against the state of Washington, Gloria Papiez, in her individual and official capacity as Director ("the **_Director_**") of the Washington Department of Financial Institutions ("**_DFI_**"), and William Beatty, in his individual and official capacity as the Administrator of DFI's Securities Division ("**_Administrator_**") (collectively "**_Defendants_**"). The Director is responsible for administering "The Securities Act of Washington." RCW 21.20 ("the **_Act_**").

4.      Mr. Meyer alleges that the Director and the Administrator, acting under color of law, have deprived him of rights and privileges, including his property interest in goodwill, secured by, and in contravention of the Constitution and laws of the United States.

5.      Mr. Meyer's right to due process (fair notice) has been violated because the Defendants improperly exercised jurisdiction under the Act on March 7, 2016, by filing charges against him for his sales of fractional interests in Life Partners, Inc.'s ("**_LPI_**") life settlements that occurred in 2011 to approximately January 31, 2012. Defendants failed to provide fair notice to Mr. Meyers that such transactions were regulated under the Act. Mr. Meyer seeks protection from Defendants' unlawful, punitive and retroactive application of the law.

6.      Prior to March 7, 2016, Defendants never promulgated rules or interpretative opinions—quite the opposite, as discussed below—that LPI life settlements were investment contracts (hence securities) under the Act.

7.      At the time of Mr. Meyer's sales of LPI life settlements, the investments were not considered to be securities under federal law. _SEC. v. Life Partners, Inc_., 87 F.3d 536 (D.C. Cir. 1996).

8.      On March 7, 2016, Defendants concluded, for the first time—taking a position contrary to established federal law, and with no Washington case law to the contrary—that LPI life settlements were investment contracts; four years <u>after</u> Mr. Meyer's sales.

9.      It is unreasonable and arbitrary for Defendants to administratively prosecute Mr.

Meyer, to defame him and damage his goodwill, for not knowing (or even suspecting) in 2011-2012 what Defendants only concluded on March 7, 2016.

10.     This Court should declare that Defendants did not provide adequate notice of their determination they had subsequently asserted securities jurisdiction over LPI life settlements, and order injunctive relief in favor of Mr. Meyer to prevent Defendants from continuing their civil right violations, grant damages for tort claims, and award attorney fees.

## II. JURISDICTION AND VENUE

11.     This Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983. This Court has supplemental jurisdiction over the state tort claims under 28 U.S.C. § 1367(a). This action seeks declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

12.     Jurisdiction over individual agents of the State of Washington, in their individual and official capacity, is invoked pursuant to the *ex Parte Young,* 209 U.S. 123, 125 (1908), exception to Eleventh Amendment immunity.

13.     Venue is properly in the United States District Court for the Western District of Washington at Tacoma. 28 U.S.C. § 1391.

## III. FACTS

### A.     What This Case Is About And Why It Is Important.

14.     This case is about how the Defendants—all State Officials in the executive branch of the State of Washington—determined, outside the rulemaking process, what the law was with respect to LPI life settlements, in a manner inconsistent with Defendants tacit acquiescence of such transactions for nearly a decade, and then applied its legal determination retroactively to punish Mr. Meyer without due process (fair notice). The Defendants' accusation of fraud was serious and has had far reaching consequences to Mr. Meyer. This action is also about the continuing harm to Mr. Meyer's goodwill resulting from the Defendants' persistence in their unlawful, administrative prosecution.

15.     This case is also about how Defendants were not specific or diligent in bringing their prosecution. Rather, Defendants failed to make an individualized assessment of Mr. Meyer's conduct,

including failing to review information provided to them by Mr. Meyer that specifically negated assertions in the Statement of Charges ("SOC") before charging him, along with nineteen (19) others, with multiple violations of the Act, including securities fraud. Certainly, one can expect that a securities regulator will review its own file before bringing charges.

**B.     LPI: The Limits Of Securities Jurisdiction.**

16.     LPI was a Texas company that brokered the sale of existing life insurance policies to third-party investors for more than their cash value, but less than their death benefit. LPI has some notoriety, as mentioned above, because it successfully challenged the SEC's jurisdiction in *SEC. v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996) (holding fractional interests in life settlements are not investment contracts (securities) because investor profit turns on when an insured person dies, not the post-sale managerial efforts of LPI).

17.     In 2010, the SEC commissioned a Life Settlement Task Force to consider the regulation of life settlements, since these products were not, generally, subject to the federal securities laws. The Task Force's Report advised that a legislative solution should be considered:

> [T]he Commission [should] consider recommending to Congress that it amend the definition of "security" under the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940 to include life settlements. The amendment would clarify the status of life settlements under the federal securities laws and provide for consistent treatment of life settlements under both federal and state securities laws.

*Life Settlement Task Force - Staff Report*, at 39.[1]

18.     The law in LPI's home-state was consistent with federal law as well. Until May 8, 2015, Texas state courts uniformly agreed that LPI life settlements were not investment contracts, and thus not were subject to Texas securities laws. *Griffits v. Life Partners, Inc.*, 2004 WL 1178418 (Tex.App. - Waco 2004); *Arnold et al. v. Life Partners, Inc. et al.*, 2011 WL 9374216, (14th Jud. Ct. Dallas Cty 2011) *rev'd*, 416 S.W.3d 577 (Tex.App. - Dallas 2013) *aff'd*, 464 S.W.3d 660 (Tex., May 8, 2015).

---

[1] Available here: https://www.sec.gov/files/lifesettlements-report.pdf (last visited May 10, 2018).

Complaint – Civil Rights Violations
Page - 4

19.     No Washington state court has ever held that LPI life settlements, nor *any* other sponsors of the sale of life settlements, are investment contracts subject to the Act.

20.     Life settlements are not included in the definition of "security" under the Act. RCW 21.20.005.

21.     In the absence of Washington state law to the contrary, it is reasonable to consider federal law for the definition of a "security." *State v. Argo*, 915 P.2d 1103, 1107 (Wash. Ct. App. 1996) ("Washington courts look to federal law to determine the meaning of the term 'security' under the Washington Act."); *see also*, RCW 21.20.900 ("This chapter shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this chapter with the related federal regulation.").

22.     Or about September 28, 2002, the Director issued a rule that stated, "A viatical or life settlement agreement constitutes a security if the agreement falls within the definition of 'security' under RCW 21.20.005 as an 'investment contract.' " WAC 460-10A-215.[2] At the time this rule became effective, LPI life settlements were not "investment contracts" under federal law.   *SEC. v. Life Partners, Inc*., 87 F.3d 536 (D.C. Cir. 1996).

23.     Prior to March 7, 2016, the Director issued no interpretative opinions regarding WAC 460-10-A-215, to clarify the circumstances when LPI life settlements are or are not securities.

24.     On or about January 11, 2012, the SEC commenced an enforcement action against LPI's public company parent, Life Partners Holding, Inc. ("***LPHI***"), and its principals for violations of the Securities Exchange Act of 1934 (the "***1934 Act***") as LPHI was a reporting company registered under the 1934 Act, not because it was asserting that life settlements were investment contracts. *SEC v. LPHI*, Case No. 1:12-cv-00033-JRN-AWA (W.D. Tex. filed Jan. 11, 2012). Ultimately, the costs and penalties from the SEC's action tipped LPHI into filing for protection under bankruptcy law. *In re LPHI*, Case No. 15-40289-rfn-11 (N.D. Tex. filed Jan. 20, 2015).

---

[2] Viatical policies involve life insurance policies where the insured is expected to live less than 24 months. The great majority of Life Partners viaticals involved people diagnosed with AIDS, and who were originally predicted to live less than one year, however, medical advances allowed them to live significantly longer. Mr. Meyer did not sell viaticals in Washington.

Complaint – Civil Rights Violations
Page - 5

25.     On or about March 11, 2016, the N.D. Texas Chapter 11 Trustee filed an Original Complaint against individual LPI licensees, including Mr. Meyer, for violations of Texas securities laws. *Life Partners Creditors Trust, et al v. 72 Vest Level Three, L.L.C. et al*, Case No. 4:16-cv-0330-A (N.D. Tex. closed Nov. 17, 2017).  Only then did Washington decide that LPI's life settlements were investment contracts, following the bankruptcy Trustee's lead, not its own individual findings of Mr. Meyer.

26.     On November 17, 2017, the Hon. District Judge McBryde dismissed the securities claims against all LPI licensees with prejudice. *Id*., at Docket Entry ["DE"] 70, n.17 (noting, "Plaintiffs admit that the investments at issue were not even determined to be securities until **after** the bankruptcy filings."). (Emphasis added). Judge McBryde's footnote was a clear reference to *Arnold*, 464 S.W.3d 660.

### C.     Mr. Meyer's Due Diligence Before Making Any Sales In Washington.

27.     On or about February 2009, Mr. Meyer's registered insurance brokerage company, Strategic Insurance Services, LLC, entered into licensee agreement with LPI. In essence, the agreement authorized Mr. Meyer to market and sell LPI life settlements to clients who qualified as "accredited investors" as that term is defined in SEC Rule 501 (a), and to persons with whom he had established a substantive preexisting personal or business relationship.

28.     LPI provided Mr. Meyer with a blue sky memorandum dated May 18, 2010 that identified the twenty-one (21) states where a LPI licensee could sell to accredited investors without violating applicable state securities law. While LPI's blue sky survey disclaimed providing legal advice, and informed licensees to consult with a securities lawyer, this type of memorandum is typical in securities offerings, and is routinely relied upon by securities professionals. By providing such an analysis, LPI acknowledged that some states did indeed regard life settlements to be securities. Accordingly, care was taken to make sure that private placement protocols were maintained, if sales were consummated states that considered life settlements to be securities.

29.     In 2011, two accredited investor clients of Mr. Meyer's investment advisory firm became interested in purchasing LPI life settlements (and other life settlements sold on the secondary market via a life settlement exchange). The clients resided in Washington.  The clients were interested

Complaint – Civil Rights Violations
Page - 6

in purchasing non-correlated assets, given the historically bad market conditions at the time. One of the clients also sought the asset before effecting a rollover of holdings in a traditional qualified account to a Roth account, to lower the client's valuation for purposes of required minimum distributions for his retirement accounts.

30.     As part of Mr. Meyer's due diligence, before making any offers or sales of LPI life settlements in Washington, Mr. Meyer contacted his Washington licensed securities lawyer, John Carr, for advice on complying with Washington securities law. Mr. Carr reviewed the Act, then contacted DFI. Thus, Mr. Meyer did exactly what DFI's recommended – consult a securities lawyer (*see* paragraph 34 below).

31.     The DFI employee that Mr. Carr spoke with did not tell him that life settlements were considered securities under the Act.

32.     The DFI employee told Mr. Carr to call the life settlement promoter, LPI, for guidance. Mr. Carr then completed a conference call with LPI's lawyer, Justin Blount, who verified that the Act did not apply, and Mr. Carr advised Mr. Meyer accordingly.

33.     Mr. Blount's position was consistent with the Act, since Washington's statutory definition of "security" tracks federal securities law and Washington appellate courts agree that it is reasonable to follow federal law when determining the definition of a "security." *State v. Argo*, 915 P.2d at 1107.

34.     Defendants' website, to this day, advises the public to consult with a securities lawyer about whether a life settlement transaction involves a security: "To determine whether a contemplated life settlement transaction involves a security, you are encouraged to consult with a private attorney that has experience in securities laws."[3] If a seasoned, regulated person acting in good faith needs a securities attorney to interpret DFI's authority over life settlement transactions, then Washington's rules are not clear.

/ / /

/ / /

[3] https://dfi.wa.gov/industry/life-settlement-investments (last visited May 10, 2018).

Complaint – Civil Rights Violations
Page - 7

**D.      Washington Knew Of LPI's Activities For Nearly A Decade And Did Nothing To Clarify Its Authority Over The Transactions.**

35.      In August 2007, the Director issued an administrative subpoena to LPI, but LPI refused to comply, on the grounds that the Director lacked securities and extra-territorial jurisdiction. LPI's September 26, 2007 response letter cited to *Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996) and *State v. Argo*, 915 P.2d 1103.

36.      The Director did not enforce the 2007 subpoena on LPI and eventually closed its investigation.

37.      Since closing that 2007 investigation, the Director has issued no public guidance on its securities jurisdiction over life settlements promoted by LPI.

38.      Prior to March 7, 2016, Defendants have never taken enforcement action against LPI.

39.      In August 2007, a former DFI employee (who was also a Washington licensed attorney) notified the Defendants in writing that their authority over life settlements was unclear.

40.   The Director's rule and website-pages which reference "life settlements" fails to identify the parties or conduct that is subject to the Act. If the Defendants' authority over life settlements was clear to the regulated public, there should be no reason to tell participants in these transactions to consult with a securities lawyer.  "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." *General Electric, Co. v. Environmental Protection Agency*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).[4]

/ / /

---

[4] Importantly, the 19 other Respondents also didn't understand the Defendants' authority over LPI life settlements at the time they sold them. The number of Respondents named in the March 7, 2016 SOC is prima facie evidence that Defendants didn't provide adequate notice. And, as noted above, Defendants admitted they concluded – for the first time – that LPI life settlements were investment contracts on March 7, 2016.  That said, it is true that a securities regulator should have discretion to ferret out new schemes, (*see generally, State v. Whiteaker*, 118 Or. 656 (1926)), but nothing materially changed about LPI's product between 1996, when the D.C. Circuit said it was not a security, and Mr. Meyer's final sales in 2012. Fundamentally, investor profit or loss is still determined by the date that an insured dies. However, what did change with respect to LPI was that the SEC filed a lawsuit against the company under the 1934 Act. There, the SEC discovered that LPI insiders engaged in bad acts, something unknown to Mr. Meyer before the SEC's lawsuit. Thus, between 1996 and 2012, Defendants had ample opportunity to clarify its authority over life settlements through legislative initiative or rulemaking, but chose not to.

Complaint – Civil Rights Violations
Page - 8

**E.**     **Mr. Meyer's Sales To Two Accredited Investors In Washington.**

41.     In 2011 to approximately January 31, 2012, Mr. Meyer sold LPI life settlements to the two Washington clients previously discussed, earning approximately $40,000 in commissions from $570,000 in sales.

42.     In making these sales, Mr. Meyer disclosed:

- All commissions and fees;
- A December 21, 2010 Wall Street Journal article titled "Odd Skew Against Investors on Bets Against Strangers' Lives";
- A January 20, 2011, Wall Street Journal article titled "S.E.C. Probes Company over life Span Data" (the "***Wall Street Journal Article***");
- A February 12, 2009, report titled "LPI: This Partner May Not Be Good for You";
- The nature and outcome of the Colorado's Securities Commissioner's lawsuit against LPI, which settled in 2009 (with no finding of fraud) (the "***Colorado Settlement***"); and
- For sales in and after January 2012, the nature of the SEC's lawsuit.

Finally, Mr. Meyer specifically instructed both Washington clients not to purchase any LPI life settlements until after the SEC's lawsuit was resolved.

43.     The articles noted were generally critical of LPI and the company's opinion on life expectancies, which had been historically short prior to 2011; meaning, an investor had to continue making premiums until an insured (who was living longer than LPI had calculated) died. Such an outcome would reduce an investor's return on investment.

44.     Mr. Meyer wanted his clients to understand the risk of relying too heavily on life expectancies, and he searched for policies that described severe medical histories to reduce the risk of long maturities.

45.     Mr. Meyer made no further offers or sales of LPI life settlements in Washington after 2012.

46.     On January 12, 2012, DFI employees examined Mr. Meyer's registered investment adviser, Strategic Group Financial Advisors, Inc. DFI's examiner reviewed the two Washington clients' files to assess their status as accredited investors and suitability of the life settlement

investments.

47.     Nowhere in DFI's 14-page exam letter (dated February 2, 2012) does it mention that Mr. Meyer or his firm engaged in the unregistered sales of securities.

48.     Furthermore, upon information and belief, the DFI examiner instructed Mr. Meyer's advisory firm to segregate life settlements and life insurance contracts from its securities files.

**F.     Defendants' Administrative Prosecution.**

49.     On or about October 2014, the Defendants, acting through a subordinate DFI employee ("***A.Y.***"), who is also a Washington licensed attorney, demanded Mr. Meyer produce documents related to sales of LPI life settlements in Washington. The letter advised, "these life settlements **may** constitute securities under Washington law." (Emphasis added).

50.     As a former registered investment adviser representative in Washington, Mr. Meyer understood he had an obligation to cooperate with the Defendants.

51.     On December 26, 2014, Mr. Meyer disclosed approximately 100 pages of responsive records to the Director and A.Y., including the disclosure documents noted in paragraph 42 (above). He later supplemented the production with copies of his client notes. The notes memorialized his discussions about the risks and rewards of investing in LPI life settlements in significant detail.

52.     On or about February 3, 2015, A.Y. received a response to an "Investor Questionnaire" from one of Mr. Meyer's Washington clients ("***J.S.***"). J.S. stated his investment was "very good" and he acknowledged receipt of "various articles" from Mr. Meyer.

53.     A.Y. did not contact Mr. Meyer's other Washington client.

54.     In J.S.'s response, he attached copies of documents that Mr. Meyer disclosed, including the Wall Street Journal article and articles that discussed the Colorado Settlement.

55.     Based on Mr. Meyer's and J.S.'s submissions, the Director, Administrator, and other DFI employees, including A.Y., clearly had sufficient information to know what information Mr. Meyer disclosed to his Washington client(s).

56.     Nevertheless, on March 7, 2016, the Defendants issued an eleven (11) page Statement of Charges ("***SOC***") against Mr. Meyer and his company Strategic Insurance Services, LLC.

57.     The SOC was based in large part on the report of the Trustee of the LPI bankruptcy;

meaning, the SOC was not tailored to the facts that DFI had in its possession with respect to Mr. Meyer's conduct. *In re LPI*, DFI Case No. S-14-1603-15-SC01. The SOC was signed by the Administrator, who reports to the Director, and three other DFI employees.

58.     The SOC charged: 1) Mr. Meyer committed fraud by failing to disclose the Wall Street Journal Article, his fees, and the Colorado Settlement, all in violation of RCW 21.20.010; 2) that he sold unregistered LPI life settlements, in violation RCW 21.20.140; 3) Mr. Meyer did not have a salesperson or broker-dealer license, in violation of RCW 21.20.040; and 4) the SOC sought to impose a penalty of $4,000. The SOC was issued despite the fact that DFI had in their possession uncontroverted evidence that the omissions allegations in the SOC were untrue.

59.     Defendants did not file the SOC on behalf of Mr. Meyer's investors to recover damages from their purchases of LPI life settlements. Rather, the SOC was an enforcement action that sought monetary penalties against Mr. Meyer for purported violations of the Act.

60.     The SOC's securities fraud allegation, if made into a Final Order, would have prohibited Mr. Meyer from working as a private fund advisor because of the "bad actor" provision under SEC Rule 506(d). Likewise, he would have been prohibited from being involved in private placement offerings for other businesses ventures.

61.     The SOC's fraud allegation had the effect of immediately causing Minnesota Mutual Life Insurance Company to drop Mr. Meyer's appointment, resulting in lost income during 2016 and 2017. He has been unable to obtain an appointment with another top-tier life insurance company since being charged.

62.     The SOC was published on Defendants' controlled website.

63.     The public posting of the SOC has caused potential clients to decline investing in the private fund that Mr. Meyer is involved with.

64.     On or about May 19, 2017, the Administrator boasted about the SOC at the Annual Conference of the Northwest Securities Institute. A handout from the event named Mr. Meyer and described the charges.

65.     On or about July 25, 2017—in an answer to Mr. Meyer's interrogatory—DFI employees, and therefore the Director and Administrator, admitted that they did not conclude LPI life

settlements were securities until March 7, 2016:

> Interrogatory No. 12: When did DFI take the position that LPI life settlement were securities and what was the basis of the determination?
>
> Answer: Objection. The request seeks the mental impressions of counsel as to legal conclusions. [cite omitted]. The request therefore improperly seeks attorney work product. Without waiving, DFI issued its Statement of Charges in their matter on March 7, 2016. This is the first time that DFI asserted, in the context of an administrative or civil action, the LPI life settlements specifically were securities. DFI had previously taken action in viatical cases as early as 1998.

66.    On or about July 25, 2017, Defendants knew that A.Y. stated in an answer to an interrogatory that J.S., Mr. Meyer's client, made a "complaint" to DFI related to his investment in LPI life settlements.

67.    Prior to A.Y. contacting him, J.S. never contacted DFI and did not complain about anything related to Mr. Meyer or LPI.

68.    J.S. exercised independent judgment in making a decision to invest over Mr. Meyer's recommendation not to do so. J.S. was happy with the investment and with Mr. Meyer's help in sale of LPI life settlements.

69.    On August 11, 2017, J.S. executed a sworn affidavit stating, in relevant part:

> At the time of my investment we had a net worth in excess of $1,000,000, excluding the value of my primary residence … I was interested in purchasing life settlements because I wanted to diversify my portfolio with an asset class that was not correlated to investments in the capital markets after the recent sub-prime crisis and I wanted to preserve capital and believed, and still believe that life settlements provide a bond type of return that preserves capital and was made aware of the fact that life expectancies among the insured, and therefore the returns, may vary widely between the policies purchased… Mr. Meyer answered any and all the questions and concerns I had about these contracts. I believe I had a reasonable understanding of the risks and potential benefits of these contracts before I purchased them. Mr. Meyer recommended against the Life Partners investment, and suggested we wait until the SEC investigation provided more clarity. In 2011 and 2012, I purchased a number of Life Partners life settlements. Overall, I have been satisfied with the returns. On or about January 2015, [DFI] sent me a questionnaire about the life settlements I purchased. I never filed a complaint with DFI about these contracts and informed DFI that Mr. Meyer discussed various articles with me about Life

Partners and had provided them with copies that Mr. Meyers had provided me.

70.     On July 14, 2017, Mr. Meyer filed a Motion to Dismiss the SOC, claiming: 1) the Director lacked securities jurisdiction at the time of Mr. Meyer's sales; 2) the SOC violated due process (fair notice) and the *ex post facto* clause of article 1, section 3 of the Washington Constitution; and 3) that the Washington Life Settlement Act, RCW 48.102, governed the transactions at issue.

71.     On September 2017, Administrative Law Judge Lisa Dublin ("***Judge Dublin***") denied the Motion to Dismiss in all aspects. *In re LPI*, Docket No. 06-2016-DFI-00011 (Washington State Office of Administrative Hearings).

72.     On or about September 29, 2017, Mr. Meyer moved for Summary Judgement, renewing arguments he had previously made. Mr. Meyer supported the dismissal of the fraud charge with his own declaration, JS's affidavit, and by arguing that statements of opinion—e.g., an opinion of life expectancy—are not statements of fact under Washington securities law. *Graham-Binham v. John Hancock*, 827 F.Supp.2d 1275 (W.D. Wash. 2011);

73.     On January 17, 2017, Judge Dublin ordered Summary Judgement in favor of the Director on its securities jurisdiction, but declined issuing an order on the fraud and the licensing issues.

74.     On January 17, 2017, Mr. Meyer and the Director entered into a Joint Stipulation that dismissed the fraud charge. The Joint Stipulation allowed Mr. Meyer to appeal the Director's securities jurisdiction to the Director and further seek judicial review with a Washington state court. At the time of this filing, the Director's delegate is reviewing Mr. Meyer's Petition for Review.

75.     While the Joint Stipulation may address the question of whether the Director had securities jurisdiction, it does not resolve the due process (fair notice) issue nor the ongoing harm to Mr. Meyer's goodwill and business relationships caused by Defendants' unlawful overreach.

/ / /

/ / /

/ / /

Complaint – Civil Rights Violations
Page - 13

**CAUSES OF ACTION**

**Count One – Civil Rights Violation**

76.     Plaintiff realleges paragraphs 1 through 75.

77.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

78.     Under Washington law, "goodwill is a property or asset which usually supplements the earning capacity of another asset, a business or a profession. Goodwill is not the earning capacity itself. It is a distinct asset of a professional practice, not just a factor contributing to the value or earning capacity of the practice." *In re the Marriage of Judith Hall*, M.D., 103 Wash.2d 236 (1984).

79.     At all times relevant to this Complaint, Mr. Meyer enjoyed substantial goodwill. The goodwill was earned the hard way: three decades of hard work, honesty, and building and maintaining trusted relationships.

80.     Defendants Papiez and Beatty deprived, and continue to deprive, Mr. Meyer of his goodwill without due process (fair notice) of the law, in violation of 42 U.S.C. § 1983.

81.     Defendants' pursuit of a monetary penalty for conduct that was lawful is punitive in nature and violates the *ex post facto* clause of article 1 § 10 of the United States Constitution, and also in violation of 42 U.S.C. § 1983.

**Declaratory and Injunctive Relief**

82.     Federal courts may declare the "rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201.

83.     Plaintiff asks this Court to declare that the Director, before March 7, 2016, failed to issue sufficient notice of her securities jurisdiction over LPI life settlements, in violation of the 14th Amendment's right to due process (fair notice), and in violation of 42 U.S.C. § 1983.

84.     Plaintiff asks this Court to declare that the Director's imposition of a $4,000 penalty violates article 1 § 10 of the United States Constitution and violates 42 U.S.C. § 1983.

85.     Plaintiff further asks this Court to enjoin Defendants from further depriving him of his property rights, the exact scope of such injunction to be determined after discovery.

86.     Granting any other prospective relief as may be just and equitable, including ancillary

1    relief.

2        87.    Awarding attorney fees and costs incurred by Plaintiff in preparing, filing and

3    prosecuting this action, including all fees and costs incurred in defending against the actions

4    complained of to date.

5                        **Count Two – Defamation**

6        88.    Plaintiff realleges paragraphs 1 through 75.

7        89.    On March 6, 2018, the State of Washington's Office of Risk Management received

8    Plaintiff's tort claim notice, which he filed pursuant to RCW 4.92.100.  The Washington Attorney

9    General has since opened an investigation into the tort claim.

10       90.    RCW 4.92.075 allows judgments against state employees, who are found by a court to

11   be acting in their scope of employment, to be paid by state funds.

12       91.    Defendants defamed Plaintiff by posting the false SOC on the Division's public website

13   and accusing him of securities violations at the Northwest Securities Conference.

14       92.     Plaintiff has suffered damage and injury, which are continuous and ongoing.

15               **Count Three – Tortious Interference with Business Expectancy**

16       93.    Plaintiff realleges paragraphs 1 through 75.

17       94.    During 2016, Plaintiff was an insurance salesperson holding an appointment with

18   Minnesota Life Insurance Company. He drew commissions from sales of life insurance products.

19       95.    Defendants' knew that Plaintiff was an insurance salesperson.

20       96.    Defendants unlawful administrative prosecution caused Minnesota Mutual to fail to

21   renew Plaintiff's appointment at the end of 2016.

22       97.    Plaintiff has been unable to secure an appointment with an equivalent carrier and has

23   suffered significant lost income due to his inability to sell insurance products. Plaintiff has suffered

24   damage and injury, which are continuous and ongoing

25               **Count Four – Negligent Infliction of Emotional Distress**

26       98.    Plaintiff realleges paragraphs 1 through 75.

27       99.    The foregoing conduct amounts to and constitutes the negligent infliction of emotion

28   distress.

**PRAYER FOR RELIEF**

WHEREFORE, the plaintiff requests that this court:

1.      Order the requested declaratory relief referenced in Paragraphs 82-87.

2.      Award actual, special, general, compensatory, economic and non-economic damages to plaintiff, against Defendant state of Washington;

3.      Award reasonable attorneys' fees and costs to plaintiff pursuant to 42 U.S.C. § 1988(b); and,

4.      Award such other and further relief as this Court may deem just and appropriate.

**JURY DEMAND**

Plaintiff hereby demands a jury of six.

Dated this 14th day of May, 2018.

Hugh J. McGavick, PS

By: */s/ Hugh J McGavick*_____
The Law Office of Hugh J. McGavick, PS
WSBA No. 12047
208 Lee St SW # 108
Tumwater, WA 98501
Office: (360) 867-0215
Fax:     (360) 866-8013
hughmcgavick@me.com

*Pro hac vice pending:*

William H. Caffee
Oregon Bar No. 811820
White Summers Caffee & James, LLP
Portland, Oregon
805 SW Broadway, Suite 2440
Portland, Oregon 97205
Office: (503) 419-3002
Fax:     (503) 419-3001
WCaffee@White-Summers.com

Scott L. Mullins
Oregon Bar No. 142504

Complaint – Civil Rights Violations
Page - 16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Markun Zusman Freniere & Compton, LLP
1500 SW First Avenue, Suite 1020
Portland, Oregon 97205
Office: (503) 546-0675
Fax:     (503) 224-1123
smullins@mzcalw.com

**ATTORNEYS FOR WILLIAM I. MEYER**